Spring Term
1839.

Nixon's Heirs
vs
Nixon's Adm'r.

</div>

---

# Nixon's Heirs *against* Nixon's Administrator &c.

[Mr. Owsley and Mr. McHenry for plaintiffs: Messrs. Richmond & Hickman for defendants.]

FROM THE CIRCUIT COURT FOR WARREN COUNTY.

Judge MARSHALL delivered the Opinion of the Court.

IN the year 1815, Scarlett Nixon departed this life, intestate, leaving as his only heirs and distributees, seven brothers and sisters of the half blood, and one full brother, John Nixon.

Administration of the estate of Scarlett was granted to John Morgan, in 1815; and by a settlement made with the County Court, in 1817, he appeared then to have had in hand, of the intestate's estate, about twelve

<div style="margin-left:auto;text-align:right">

CHANCERY.

8d    5
105   84

April 9.

Statement of the case.

</div>

Spring Term
1839.

Nixon's Heirs
vs
Nixon's Adm'r.

hundred and seventy dollars and sixty eight cents; upon which, it does not appear that there has since that time, been any claim save that of the distributees.

In 1827, the brothers &c. of the half blood filed this bill against the administrator and his sureties, praying for a settlement and distribution of the estate. In the progress of the suit, the representatives of John Nixon, who had died after his brother Scarlett, were made parties; and on the hearing, in 1836, the Circuit Court decreed a distribution of the original balance of twelve hundred and seventy dollars and sixty eight cents, without interest; and, of that sum, directed one third only to be distributed among the complainants, the heirs of the half blood, and decreed the remaining two thirds to the representatives of John Nixon, as heir of the whole blood.

To reverse this decree the complainants prosecute this writ of error. And although the assignment of errors presents several minor points, the two following questions only need be stated in this revision of the decree: *first*—did the Court err in the ratio of distribution adopted? *second*—should interest have been charged against the administrator?

The personal estate of a decedent who died intestate and without wife or child, is (by the act of '97, S. L. 660,) to be distributed in the same proportions and to the same persons as lands are directed to descend by the act of 1785, directing the course of descents. And—Where an intestate had neither father, nor mother, nor child, at his death, his brothers and sisters are his heirs, & distributees, and if some of these heirs are of the half blood and some of the whole blood, "those of

*First.* The first of these questions depends upon the proper construction of the statutes relating to the distribution and descent of intestate's estates. By the 28th section of the act of 1797, (1 *Stat. Law*, 660,) the personal estate of an intestate dying without wife or child is directed (after payment of debts,) to be "distributed in the same proportions and to the same persons as lands are directed to descend in by an act entitled "'an act directing the course of descents.'" As decided in the case of *Scroggin* vs. *Allen*, 2 *J. J. Marsh.* 467, the act here referred to is that of 1785, entitled 'an act directing the course of descents.' 1 *Stat. Law*, 560.

As the intestate in this case died without father, mother or child, and leaving no descendants of a deceased brother or sister, his eight surviving brothers and sisters, his nearest collateral kindred, were, by the fourth section of the act of 1785, his only heirs and distributees. The thirteenth section of the act provides, that "if part

"of such collaterals be of the whole blood, and other "part of the half blood only, those of the half blood "shall inherit only half so much as those of the whole "blood; but if all be of the half blood, they shall have "whole portions, only giving to the ascendants (if there "be any) double portions."

The question upon this clause, is whether when part of the collaterals are of the half and other part of the whole blood, the statute intends that those of the half blood, as a class or body, shall be entitled only to half as much as those of the whole blood as a class, or whether it intends that each of those of the half blood shall be entitled to only half as much as each of those of the whole blood. Are the words 'those of the half blood' and 'those of the whole blood' used to designate the two classes collectively, or do they refer to the individuals of the two classes separately and distributively?

In opposition to the opinion of the Circuit Court, we think the statute, in making the apportionment between collaterals of the whole and those of the half blood, regards the individuals of the two classes, and not the classes collectively; and that it fixes the ratio of apportionment with reference to the individuals and not to the classes as such.

A contrary interpretation would in many instances, perhaps in one half of the cases which might occur, fail to effectuate the manifest intention of the statute to give a preference to the whole blood—a preference which, as it is certainly founded upon a distinction existing uniformly between the individuals composing the two classes, ought upon the very principle upon which it is founded, to prevail uniformly between the individuals, and in all cases in which the distinction itself exists. It is true that, in the present case, the construction which gives two thirds of the estate to the collaterals of the whole blood, and one third to those of the half blood, operates greatly to the advantage of the former, by giving to one full brother fourteen parts out of twenty one, and to each of the seven half brothers and sisters only one part out of twenty one. But if this construction be the proper one it must prevail without regard to the respec-

Spring Term 1839.

Nixon's Heirs
vs
Nixon's Adm'r.

the half blood, shall inherit only half as much as those of the whole blood, but if all be of the half blood, they shall have whole portions only giving to the ascendants (if there be any) double portions;' and these terms relate, not to classes, but to individuals: each one of the whole blood takes twice as much as any one of the half blood, and each one of the half blood half as much as any one of the whole blood. So, where one full brother and seven of the half blood were the heirs at law of an intestate, and two thirds of the distributable property was decreed to the full blood, and one third only divided among the seven half bloods, the division was erroneous: it should have been divided into nine parts—two for the full blood, and one for each half blood.

tive numbers of the two classes. And if, as might often happen, the intestate had left but one half brother and seven full brothers, the half brother would be entitled to seven parts out of twenty one, while each of the full brothers would receive but two.

If the statute had recognized no distinction and declared no preference in favor of the whole blood, then, in case of a descent to eight brothers, part of the whole and part of the half blood, each would be entitled to one equal eighth part without distinction of blood. But under the construction which we are now discussing, the consequence of the distinction made in favor of the whole blood, and of the declaration that collaterals of the half blood shall inherit only half as much as those of the whole blood, will be that, in many cases, the brother or other collateral of the whole blood will inherit less, and sometimes not half so much, as the brother or other collateral of the half blood. This result, so obviously destructive of the intention and principle of the statute, can only be avoided by the interpretation which we have adopted.

Other arguments might be adduced in favor of this interpretation; some of them arising from an examination of the language, and others from a comparison of the provisions of the section which has been quoted. But deeming it unnecessary to swell this opinion by adverting more particularly to these considerations, we pass on to the question of interest.

*Second.* The inventory, returned in January, 1817, shows the whole amount of the personal estate to have been three thousand six hundred and twenty dollars and forty eight cents; of which three thousand two hundred and twelve dollars, are therein acknowledged to have been received in cash, leaving only about four hundred dollars then uncollected. The settlement with the County Court was made in the April following, when the administrator was credited by various sums, including a liberal allowance for his services, and amounting altogether to about twenty three hundred and fifty dollars. The balance of twelve hundred and seventy dollars and sixty eight cents, may be assumed to have been

An adm'r settled with the county court, in April, 1817, when he had in his hands $1270, subject to distribution, and for which, except $160 paid to distributees at different times, he remains liable. In 1820, he acknowledged, in a letter, that he had nothing to pay distributees with, and could get nothing, but paper money—in which he promised to

then in his hands: and with the exception of a few trifling payments to some of the complainants, amounting in all to about one hundred and sixty dollars, and made at distant intervals in the course of the succeeding eight years, it is not pretended that he has paid one cent of this balance to any person entitled to it; nor does it appear that, since April, 1817, there has been any debt asserted against the administrator, or any apprehension of any such claim. What then has the administrator done with the money during this long period, that he should be exempt from the charge of interest? It may be inferred that, at the periods when he paid the several small sums to the complainants, he had no other money in hand; and his letter of July, 1820, is an acknowledgment that he had none at that time, and that he could not get any except in notes of the Bank of Kentucky or the Bank of the Commonwealth, in which medium, if suitable, he promises to make payment upon *timely notice.*

If, at this period, all the money of the estate had not been collected, so much as remained unpaid must be presumed to have been on interest. And if, as we have assumed, all had been collected, as it was evidently not on hand, nor in safe deposit to meet the exigencies of the estate, it must either have been used or loaned by the administrator, or by some one else with his permission. And as it does not appear ever to have been in his hands from 1820 to the present time, but the contrary is plainly to be inferred, the same presumption arises as to its condition from 1820 to the rendition of the decree. It is true the administrator denies the allegation that he had used the money, or loaned it on interest, and says that after the complainants had failed to comply with his requisition to prove their heirship and execute a refunding bond, he deposited it with two persons to be safely kept for the distributees &c. But he neither names the depositories, nor states the time of the deposit, nor produces any voucher showing its terms, nor makes any proof whatever of the fact; nor does he state that he has the money, either in possession or at command. Under these circumstances, the allegation of a deposit &c. amounts to nothing more than a confirmation of the

VIII. 2

<div style="float:right;">

Spring Term
1839.

Nixon's Heirs
vs
Nixon's Adm'r.

make payment upon timely notice. He denies, in his answer, that he has either used the money or made interest upon it; and alleges that he deposited it in the hands of two persons for safe keeping &c. But he does not name these persons, nor produce any voucher showing the terms of the deposit, nor adduce any proof of the fact:—This answer is deemed evasive; he is held liable for interest from the date of the letter, in 1820.

</div>

inference, otherwise sufficiently established, that he had no money in his hands. And taking the undisputed facts in the case, we are of opinion that it sufficiently appears, notwithstanding the denial of having used the money, or loaned it at interest, that the administrator has either used or loaned it on interest, or put it into the hands of some other person who has so used or loaned it, and from whom, if he is not entitled to interest by express contract, he is entitled to it by law. And we are further of opinion that no discrimination can safely be made between these cases, especially in favor of an administrator whose own statement is so vague and indefinite on the subject of the alleged deposit, and is, moreover, wholly unsustained by proof.

It seems to this Court, therefore, that the administrator should have been charged with interest at least from the first day of July, 1820: before which time he must have put the money out of his hands in one of the modes above stated.

Wherefore, the decree of the Circuit Court being erroneous both in the mode of apportioning the estate, and in omitting to charge interest, the same is reversed, and the cause remanded, with instructions to render a decree that the administrator and his sureties pay to the representatives of John Nixon, two ninths of twelve hundred and seventy dollars and sixty eight cents—the balance appearing against the administrator, on the settlement of 1817, with interest thereon, at the rate of six per cent. per annum, from the first day of July, 1820, up to the time of rendering the decree; and to each of the complainants one ninth of the said sum of twelve hundred and seventy dollars and sixty eight cents, with like interest—the respective portions to be credited by the payments made to some of the complainants, as stated in the bill and admitted in the answer.